THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HENRY THOMPSON, Defendant-Appellant.

First District (3rd Division)    No. 1—93—1487

Opinion filed September 20, 1995.

Barbara Kamm, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kenneth McCurry, and Kathryn A. Schierl, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

After a bench trial, defendant, Henry Thompson was convicted of two counts of aggravated home repair fraud (815 ILCS 515/3, 5 (West 1992)) and one count of theft (720 ILCS 5/16—1(A) (West 1992)). He was sentenced on one count of aggravated home repair fraud to 10 years' imprisonment as a Class X offender based on a previous Class 2 felony conviction. On appeal, defendant asserts that (1) the Home Repair Fraud Act (815 ILCS 515/1 *et seq.* (West 1992)) (Act) violates State and Federal due process of law in that it does not require a culpable mental state; (2) the Act's penalty provisions violate State and Federal due process of law and equal protection because the class of penalty is increased on the basis of the contract's amount instead of the value of the actual loss or harm caused; and (3) his sentence violates due process of law and the constitutional assurances of proportionate penalties. For the reasons that follow, we affirm.

The following testimony was heard at trial. Florence Korpalski, 77 years old, testified by stipulation that she was contacted by Steven Ferrand, who identified himself as Doug Keller, on January 20, 1992. Keller, a Ventura employee, came to Korpalski's home, checked her boiler, and told her that she needed a new boiler. Korpalski gave

Keller a $200 downpayment on the installation of a new boiler. The next day, a new boiler was installed under the supervision of Joseph Harput, the owner of Ventura, and Korpalski paid Harput the $3,200 balance due.

When Keller called Korpalski on January 22, 1992, she said that one of her radiators was not working. Two days later, Keller and defendant inspected the boiler and told Korpalski that the pipelines needed cleaning. Korpalski paid defendant $700 as a downpayment and arrangements were made for the cleaning to be done. On January 28, 1992, defendant came to Korpalski's home and spent an hour in the basement before Keller arrived. The two men told Korpalski that she needed a new $3,795 chimney liner or her new boiler could be damaged. Korpalski paid defendant $2,000 in cash after Keller drove her to the bank to withdraw the money.

The next day, Carey Farrell of A&C Heating Company (A&C) replaced Korpalski's chimney liner. Becoming suspicious, Korpalski called Harput and the police. She went to the police station to fill out a report, then returned home to find a message from defendant on her answering machine asking for the balance owed in cash. Korpalski called the police, then called defendant to arrange a time for him to get the money. When defendant arrived at Korpalski's home, Detective Dombrowski arrested him.

Joseph Harput, owner of Ventura, testified that Keller had been a Ventura subcontractor or salesman for five days in January 1992. Ventura received the assignment to install Korpalski's new boiler from Keller, who earned a commission for the sale. After Harput received Korpalski's call on January 30, 1992, he was unable to reach Keller.

According to Harput, the installed boiler was a deluxe model that would not be affected by a defective chimney liner because it would shut down when its special sensors detected the loss of draft. In older models, which did not have safety features, there can be serious problems created by a defective chimney. Even though Harput did not inspect Korpalski's old boiler or chimney liner, he did not think that Korpalski needed a new chimney liner. When Harput was asked whether Korpalski's boiler needed its pipes cleaned, Harput stated that he had no concept of what that meant.

Carey Farrell, an installer with A&C, testified that he had 15 years' experience installing heating and air conditioning systems and chimney liners. On January 29, 1992, Farrell received a legitimate job from defendant to install a chimney liner at Korpalski's home. The job took two hours. As a subcontractor on the job, he charged defendant between $600 and $650. According to Farrell, he would have

charged Korpalski $800 to $900 for the job if he had been the contractor. It was possible that he would charge up to $1,800 for that type of job.

At the close of the State's evidence, it was stipulated that defendant had been permanently enjoined in a September 17, 1979, agreed order from selling, repairing, servicing, replacing, and/or installing heating systems or any part on those systems in Illinois.

Steven Ferrand, who used the name Doug Keller when he worked for Ventura in January 1992, arranged for the installation of Korpalski's new boiler. After learning that Korpalski had other heating problems, he inspected the system and determined that the water system for the hydraulic heating was clogged and that the chimney was bent and collapsed. Because the liner was bent, there was an obstruction for the venting of gases. Ferrand claimed that the defective line could have affected the new boiler, which he did not know had sensors.

According to Ferrand, he and defendant went to Korpalski's home and reached an agreement with her to clear the old piping of obstructions and to open up the chimney. Ferrand and defendant cleaned the pipe corrosion with chemicals, but were unable to replace the pipes and radiator, so they subcontracted with A&C to repair the chimney liner.

After closing arguments, the trial court found that defendant's presence at Korpalski's home to take an order for home repair was fraudulent because he was enjoined from conducting any home repair business and Korpalski had a reasonable expectation to believe that he was allowed to do such work. Furthermore, the trial court found that Ferrand's testimony was not credible and concluded that even if the pipes had been clogged, defendant victimized Korpalski because he falsely told her that her new boiler would not work right unless she had additional work done. The trial court then found defendant guilty of aggravated home repair fraud by deception, aggravated home repair fraud by misrepresentation, and theft.

After defendant's motion for a new trial was denied, he was sentenced as a Class X offender on one count of aggravated home repair fraud to 10 years' imprisonment.

On appeal, defendant challenges the Act's constitutionality on its face. The first issue is whether the Act violates due process of law under the Illinois and Federal Constitutions in that it does not require a culpable mental state for a finding of guilty. Although the Act requires knowing conduct, defendant maintains that it does not require a criminal purpose such as an intent to defraud, thus failing to bear a reasonable relationship to the legitimate interest it was

designed to remedy. As a result, defendant contends that an innocent person can be convicted under the Act.

In this case, the defendant was indicted and sentenced for violating section 5(a) (815 ILCS 515/5/(a) (West 1992)), which states as follows:

"§ 5. Aggravated Home Repair Fraud. A person commits the offense of aggravated home repair fraud when he commits home repair fraud against a person 60 years of age or older or a disabled person as defined in Section 16—1.3 of the Criminal Code of 1961.

(a) Aggravated violation of paragraphs (1) or (2) of subsection (a) of Section 3 of this Act shall be a Class 2 felony when the amount of the contract or agreement is more than $1,000, a Class 4 felony when the amount of the contract or agreement is $1,000 or less, and a Class 3 felony for a second or subsequent offense when the amount of the contract or agreement is $1,000 or less. If 2 or more contracts or agreements for home repair exceed an aggregate amount of $1,000 or more and such contracts or agreements are entered into with the same victim by one or more of the defendants as part of or in furtherance of a common fraudulent scheme, design or intention, the violation shall be a Class 2 felony."

In this bench trial, the pertinent sections of the Home Repair Fraud Act based on the evidence are sections 3(a)(1) and (a)(2) (815 ILCS 515/3 (a)(1), (a)(2) (West 1992)), which state as follows:

"§ 3. Home Repair Fraud.

(a) A person commits the offense of home repair fraud when he knowingly enters into an agreement or contract, written or oral, with a person for home repair, and he knowingly:

(1) Misrepresents a material fact relating to the terms of the contract or agreement or the preexisting or existing condition of any portion of the property involved, or creates or confirms another's impression which is false and which he does not believe to be true, or promises performance which he does not intend to perform or knows will not be performed; or

(2) uses or employs any deception, false pretense or false promises in order to induce, encourage or solicit such person to enter into any contract or agreement[.]
* * *

Intent and knowledge shall be determined by an evaluation of all circumstances surrounding a transaction and the determination shall not be limited to the time of contract or agreement."

To support his argument, defendant relies on *People v. Wick* (1985), 107 Ill. 2d 62, 481 N.E.2d 676, and *People v. Zaremba* (1994), 158 Ill. 2d 36, 630 N.E.2d 797, which are both distinguishable. In

*Wick*, the court held that the aggravated arson statute was not rationally related to the legislature's goal of punishing a person who commits aggravated arson more severely than someone who commits simple arson because the aggravated arson statute required no culpable mental state whatsoever. On the other hand, the simple arson statute required a culpable mental state. *Wick*, 107 Ill. 2d 62, 481 N.E.2d 676.

In *Zaremba*, 158 Ill. 2d 36, 630 N.E.2d 797, the court concluded that the statute did not bear a reasonable relationship to its purpose because it potentially subjected innocent conduct to punishment without requiring a culpable mental state (*Zaremba*, 158 Ill. 2d at 42), which is not the case here.

■ To constitute a legitimate exercise of the police power, a legislative enactment must bear a reasonable relationship to the public interest intended to be protected and the means adopted must be a reasonable method of accomplishing the desired objective. (*Illinois Gamefowl Breeders Association v. Block* (1979), 75 Ill. 2d 443, 453, 389 N.E.2d 529.) Once the legislature determines that a problem exists and acts to protect and promote the general welfare of its citizens, the legislation is presumed to be a valid exercise of the State's police power. (*Illinois Gamefowl Breeders Association*, 75 Ill. 2d at 453.) Furthermore, the due process clauses of the State and Federal Constitutions, insofar as they operate to limit the State's police power, prohibit only its arbitrary or unreasonable use. *Illinois Gamefowl Breeders Association*, 75 Ill. 2d at 453.

> "[I]f a law bears a reasonable relationship to a proper legislative purpose and is neither arbitrary nor discriminatory, the requirements of due process are met and the courts will not substitute their judgment for that of the legislature." *Illinois Gamefowl Breeders Association*, 75 Ill. 2d at 454.

Because all statutes are presumed to be constitutional (*Opyt's Amoco, Inc. v. Village of South Holland* (1992), 149 Ill. 2d 265, 277, 595 N.E.2d 1060), a court must interpret the statute as constitutional and valid if it can reasonably be done. (*People v. Anderson* (1992), 148 Ill. 2d 15, 22, 591 N.E.2d 461; *People v. Haywood* (1987), 118 Ill. 2d 263, 271, 515 N.E.2d 45.) The party challenging the statute has the burden of clearly establishing any constitutional violation. *Opyt's Amoco, Inc.*, 149 Ill. 2d at 277.

The primary objective of statutory interpretation is to ascertain and give effect to the legislature's intent (*Zaremba*, 158 Ill. 2d at 40), which is determined primarily from the legislative language. (*DiFoggio v. Retirement Board of the County Employees Annuity & Benefit Fund* (1993), 156 Ill. 2d 377, 382, 620 N.E.2d 1070; *People v. Lowe*

(1992), 153 Ill. 2d 195, 201, 606 N.E.2d 1167.) If the legislative intent can be ascertained from the statute's language, there is no need to resort to other aids for construction. (*DiFoggio*, 156 Ill. 2d at 382; *People v. Bryant* (1989), 128 Ill. 2d 448, 455, 539 N.E.2d 1221.) However, if the language is ambiguous, it is appropriate to examine the statute's legislative history. *Zaremba*, 158 Ill. 2d at 40.

■ We conclude that the Home Repair Fraud Act's title, the plain meaning of its terms, and its legislative history criminalize conduct based on fraud or deceptive practices used in the field of home repairs, and the Act does not include potentially innocent conduct within its scope. The legislature specifically defined the kind of conduct constituting home repair fraud by specifically providing that a person is guilty of home fraud if he or she knowingly enters into an agreement for home repair and knowingly either misrepresents a material fact in the agreement; misrepresents the condition of the property; creates or confirms a false impression; promises performance he or she does not intend to perform; or uses deception or false promises to induce an agreement. 815 ILCS 515/5 (West 1992).

Because the language does not clearly require a culpable mental state throughout all of its provisions, we must look to the Act's legislative history. The Act's legislative history establishes that its purpose is to prohibit and prevent the knowing use of fraud or deception to induce an agreement for home repairs from an unwitting homeowner, especially elderly homeowners who rely on fixed incomes. In the House debates, Representative Homer stated the following:

"[I]t's an offense for a person to enter to [*sic*] a home repair contract when he does so fraudulently and when he also misrepresents material fact, uses or employs diceptions [*sic*], enters into a unconscionable contract or fails to comply with the Assumed Name Act in the statute.

\* \* \*

\*\*\* [T]he Bill does have some strong medicine for those who would attempt to defraud citizens in the area of home repair fraud, particularly if those citizens are senior citizens." (84th Ill. Gen. Assem., House Proceedings, June 23, 1986, at 38-39.)

Clearly, the legislature's intent was to punish those whose culpable mental state is to defraud and the statute is rationally related to that intent.

In addition, the following exchange took place:

"Hawkinson: \*\*\* If you represent that you're [*sic*] work is going to be sufficient to solve a problem and it doesn't, does that subject you to criminal penalties?

Homer: No, not if it were an innocent misrepresentation. But the...

Hawkinson: How will you define the difference between normal breach of contract, which we're all familiar with, and failure to...failure to live up to one of the implied warranties that might apply to the case? And how would you distinguish those normal breaches from criminal conduct?

Homer: Well, the key word, Representative Hawkinson, would be on line 22. It says that person commits the offense when he knowingly misrepresents a material fact or confirms anothers [sic] misimpression which is false and it also provides on line 27 that he does not believe to be true. And further, that he does not intend to perform or knows will not be performed. So, the element of knowledge or scienter that's normally required for a criminal offense is clearly set out in the Amendment. And I think any typical contract breach that certainly did not entail this element of scienter would not be covered under this provision." 84th Ill. Gen. Assem., House Proceedings, June 23, 1986, at 41-42.

After considering the Act's language and legislative history, we conclude that it is rationally related to the legislature's goal in enacting it. The Act's goal is to prohibit and prevent the knowing use of fraud and deceptive practices to induce an unwitting homeowner to enter into a contract for home repairs. The Act is clearly a reasonable means of achieving that legislative goal because it operates to criminalize precisely the type of conduct that the legislature sought to prevent by its enactment. Accordingly, we conclude that the Act is constitutional on its face.

The next issue is whether the Act's sentencing scheme violates due process of law, equal protection, and the constitutional objectives of the Illinois and United States Constitutions in that it penalizes defendants for nonexistent harm or injury. Defendant claims that the Act unconstitutionally increases the class of penalty on the basis of the contract's amount instead of the value of the actual loss or harm caused. Defendant's argument is based on the proposition that actual loss or harm is the amount of money that is lost. As a result, defendant contends that the Act's penalty provisions do not reasonably remedy the evils the legislature sought to remedy.

Pursuant to the Act's penalty provisions, the trial court sentenced defendant to a Class 2 felony sentence because the amount of his contract with Korpalski was over $1,000 and Korpalski was over 60 years of age. Although defendant entered into a contract in excess of $1,000 with Korpalski, he maintains that the value of any actual injury or loss to Korpalski was under $1,000 since actual repair work was done and her chimney liner was replaced. Defendant calculates

that Korpalski's actual loss was less than the $2,700 she paid defendant. Because Farrell testified that the fair market value of the repair could have been $1,800 or more, defendant reduces the actual harm or loss to under $1,000. This would constitute only a Class 4 felony. Farrell, who installed the liner and was familiar with prices charged in the industry, testified that such work cost between $800 to $1,800. Moreover, defendant argues that he and Ferrand flushed out the pipes, which would have further reduced the amount of Korpalski's loss or harm.

Defendant contrasts the section under which he was convicted with section 3(b)(1), under which a person can damage another's home in the amount of over $1,000 with the intent to enter into a home repair contract, but does not actually contract to do so because the homeowner became suspicious. A violation of section 3(b)(1) is a Class 4 felony regardless of the amount of the proposed contract and the aggravated violation of section 3(b)(1) is a Class 3 felony regardless of the proposed contract amount.

We find the defendant's argument unconvincing. Article I, section 11, of the Illinois Constitution requires, in pertinent part, that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Ill. Const. 1970, art. I, § 11; *People v. Steppan* (1985), 105 Ill. 2d 310, 319, 473 N.E.2d 1300.) The legislature has the power to declare and define conduct constituting a crime and to determine the nature and extent of punishment in order to protect the interests of our society. (*Steppan*, 105 Ill. 2d at 319-21.) Its acts will not be interfered with unless they are clearly in violation of some constitutional limitation. *People v. Lawrence* (1945), 390 Ill. 499, 509-10, 61 N.E.2d 361.

With regard to the due process provision, the penalty prescribed for the particular crime must be reasonably designed to remedy the evils that the legislature has determined to be a threat to the public health, safety, and general welfare. (*Steppan*, 105 Ill. 2d at 319.) A crime's seriousness is not necessarily equated with the value of the property taken. (*Steppan*, 105 Ill. 2d at 320.) While value is often and properly considered in fixing penalties, it is not the only consideration open to the General Assembly. (*Steppan*, 105 Ill. 2d at 320.) A statute may seek to protect interests other than property or the legislature may perceive a need to enact a more stringent penalty provision in order to halt an increase in the commission of a particular crime. (*Steppan*, 105 Ill. 2d at 320.) These factors, among others, may properly be taken into consideration in determining the seriousness of the offense in question. *Steppan*, 105 Ill. 2d at 320.

Defendant mistakenly equates actual harm to the victim and the seriousness of the offense with the actual net monetary loss suffered by the victim. The actual harm suffered by a victim of home repair fraud, especially a senior citizen, may be much greater than the monetary loss incurred. Accordingly, the legislature rationally determined that the harm to the victim and the seriousness of the offense are more accurately determined based on the amount of the fraudulent contract actually entered into than the monetary loss to the victim. Additionally, the legislature properly considered the harm done to society as a whole by the criminal conduct.

A similar type of crime is forgery, where the crime is the fraud itself. In *People v. Crouch* (1963), 29 Ill. 2d 485, 488-89, 194 N.E.2d 248, the court stated that the forgery statute is "concerned with the fraudulent intent involved in falsifying an instrument or knowingly delivering it; the action is deemed criminal because of an intent to defraud rather than because such an intent is directed toward a specific individual."

■ For those reasons, we conclude that the Act's penalty provisions are rationally related to the evil that the legislature sought to remedy. The legislative goal was to prohibit and prevent knowing use of fraud to induce an unwitting homeowner to actually enter into an agreement for home repair. As a consequence of the legislature's actions, the punishment may deter others from engaging in this type of fraud more effectively than if punishment were based on monetary loss.

Defendant also asserts that the Act's penalty provisions deny equal protection guaranteed by the Illinois and United States Constitutions because defendants convicted under the Act are not punished equally based on the actual harm, loss, or injury they cause as compared to other convicted felons. We reject defendant's argument, which is essentially the same as his due process argument, and find that the statute does not violate equal protection rights.

Equal protection rights that are found in both the Federal and State Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) guarantee that the State treat similarly situated persons in a similar manner, but may treat different classes of persons differently. (*People v. Shephard* (1992), 152 Ill. 2d 489, 499, 605 N.E.2d 518.) In the exercise of its police power, the State retains broad latitude and discretion in classifying. *People v. McCabe* (1971), 49 Ill. 2d 338, 381, 275 N.E.2d 407.

If a challenged statute does not implicate a suspect or quasi-suspect classification, the appropriate standard for determining the plaintiff's equal protection rights is whether the legislation bears a

rational relationship to a legitimate governmental interest. (*DeLuna v. St. Elizabeth's Hospital* (1992), 147 Ill. 2d 57, 74, 588 N.E.2d 1139.) Applying that test to the provision, the statute must be sufficiently tailored to serve the legislative purpose it was designed to fulfill. *De-Luna*, 147 Ill. 2d at 75.

■ There is no equal protection violation. Persons convicted of aggravated home repair fraud based on misrepresentation or deception are not similarly situated to those convicted of aggravated home repair fraud based on damaging property with the intent of entering into a contract for home repair. In the first instance, the offender has already committed fraud whereas the second offender has not yet fraudulently entered into a home repair agreement. As a result, the two classes of offenders may be treated differently as long as the Act bears a rational relationship to a legitimate governmental interest. As discussed under the due process argument, the Act's penalty provisions bear a rational relationship to the government's legitimate interest in protecting homeowners from the knowing use of fraud in home repair contracts. Consequently, we conclude that the Act's penalty provisions do not violate equal protection rights.

■ The final issue is whether defendant's sentence violates due process of law and the constitutional assurances of proportionate penalties. Defendant's argument that he was improperly sentenced to 10 years' imprisonment as a Class X offender is based on the alleged disproportionality between the penalty under section 5(a) for a contract amount of more than $1,000 with a person over 60 years of age and section 5(b), which involves entering into an unconscionable contract for $4,000 or more with a person over 60 years of age. The penalty for section 5(a), which is a Class 2 violation, is three to seven years' imprisonment, whereas the penalty for section 5(b), a Class 3 violation, is two to five years' imprisonment. Moreover, defendant argues that he would not have been eligible for Class X sentencing if he had been convicted under section 5(b).

Defendant mistakenly bases his argument on the assumption that the more serious offense is that which causes the greatest net monetary loss to the victim. Because a sentence must be proportionate to the nature of the offense (*People v. Treadway* (1985), 138 Ill. App. 3d 899, 904, 486 N.E.2d 929), penalties prescribed for a more serious offense must be as great or greater than the penalty prescribed for a less serious offense. (*People v. Bradley* (1980), 79 Ill. 2d 410, 416, 403 N.E.2d 1029.) As already discussed, the legislature could and did reasonably determine that the harm and seriousness of the offense were not equivalent to the actual monetary loss suffered by the victim. As a result, the fraudulent conduct described in sec-

tion 5(a), which approaches the highest form of fraud, is more serious than the unconscionable conduct of section 5(b), and the legislature properly and rationally provided for a greater penalty for a violation of section 5(a) than for a violation of section 5(b).

Accordingly, we conclude that the Home Repair Fraud Act is constitutional on its face and affirm the circuit court judgment.

Affirmed.

GREIMAN, P.J., and RIZZI, J., concur.